**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| THE A STAR GROUP, LLC, | |
| | |
| Plaintiff, | Case No. 13-cv-4501 (PAC) |
| | |
| v. | **Oral Argument Requested** |
| | |
| MANITOBA HYDRO; KPMG LLP (CANADA); KPMG LLP (US); and MANITOBA PUBLIC UTILITIES BOARD, | **ECF CASE** |
| | |
| Defendants. | |

# EXHIBIT F

*to the*

**DECLARATION OF KENNETH E. LEE IN SUPPORT OF DEFENDANT**
**THE PUBLIC UTILITIES BOARD OF MANITOBA'S MOTION TO**
**DISMISS THE COMPLAINT AND STRIKE THE DEMAND FOR A JURY TRIAL**

| | |
|---|---|
| **MANITOBA** | **Order No. 30/10** |
| **THE PUBLIC UTILITIES BOARD ACT** | |
| **THE MANITOBA HYDRO ACT** | |
| **THE CROWN CORPORATIONS PUBLIC REVIEW AND ACCOUNTABILITY ACT** | **March 26, 2010** |

Before:     Graham Lane, C.A., Chairman
            Robert Mayer, Q.C., Vice-Chairman

### SECOND PROCEDURAL ORDER AND INTERVENER STATUS APPLICATIONS BY THE  NEW YORK CONSULTANT AND THE SOUTHERN CHIEFS ORGANIZATION INC.: MANITOBA HYDRO GENERAL RATE APPLICATION FOR 2010/2011 AND 2011/12 RATES

# Table of Contents

Page

1.0 Executive Summary ...................................................................................................2
2.0 New York Consultant's Intervener Application ........................................................4
    2.1 Submissions of the NYC ....................................................................................5
3.0 SCO Intervention Application .................................................................................18
    3.1 SCO's Intervention Submission .......................................................................19
    3.2 MH Submission ................................................................................................21
    3.3 CAC/MSOS Submission ..................................................................................21
    3.4 MIPUG Submission .........................................................................................21
    3.5 RCM/TREE Submission ..................................................................................21
    3.6 City of Winnipeg Submission ..........................................................................22
    3.7 Independent Experts Submission .....................................................................22
    3.8 NYC Submission ..............................................................................................22
4.0 Scope of Risk Review ..............................................................................................23
    4.1 MIPUG Submission .........................................................................................23
    4.2 MH Submission ................................................................................................24
    4.3 CAC/MSOS Submission ..................................................................................25
    4.4 RCM/TREE Submission ..................................................................................26
    4.5 City of Winnipeg Submission ..........................................................................26
    4.6 Independent Experts Submission .....................................................................26
    4.7 NYC Submission ..............................................................................................27
    4.8 SCO Submission ...............................................................................................27
5.0 Timetable for Hearing .............................................................................................28
6.0 Terms of Reference for Independent Experts ..........................................................28
7.0 Interim Rate Schedule .............................................................................................28
    7.1 CAC/MSOS Submission ..................................................................................28
    7.2 MIPUG Submission .........................................................................................29
    7.3 RCM/TREE Submission ..................................................................................29
    7.4 City of Winnipeg Submission ..........................................................................29
    7.5 MH Submission ................................................................................................29
8.0 Energy Intensive Industrial Rate .............................................................................29
9.0 Diesel Zone Rate Application ..................................................................................30
10.0 Board Findings .......................................................................................................30
    10.1 NYC Intervention and Risk Reports ..............................................................30
    10.2 SCO Intervention ...........................................................................................39
    10.3 Scope of Risk Review .....................................................................................40
    10.4 Terms of Reference for Independent Experts .................................................42
    10.5 April 1, 2010 Interim Rates ...........................................................................43
    10.6 Timetable ........................................................................................................44
11.0 Concluding Remarks ..............................................................................................44
12.0 IT IS THEREFORE ORDERED THAT: .................................................................45

Schedule "A" - Timetable

Schedule "B" – Procedures

Schedule "C" – Terms of Reference for Independent Experts

## 1.0      Executive Summary

By this Order, the Public Utilities Board (Board):

a)      fixes the role for the New York Consultant (NYC) in the risk review process to be conducted within the Manitoba Hydro (MH or Utility) General Rate Application (GRA), but does not grant intervener status to the NYC;

b)      grants intervener status to Southern Chiefs Organization (SCO) for the balance of the MH GRA for 2010/2011 and 2011/2012 rates;

c)      provides further details of scope respecting the risk review portion of the GRA proceeding;

d)      confirms the revised timetable for all aspects of the GRA process, including risk review;

e)      fixes the terms of reference for the independent experts appointed by the Board in Order 17/10 with regard to risk review matters; and

f)      directs MH to file revised rate schedules for the April 1, 2010 interim rates.

This Order follows the third Pre-Hearing Conference (PHC) held March 12, 2010, in a series of pre-hearing processes for the MH GRA. The March 12, 2010 PHC was convened to deal with two new intervener applications as well as certain ongoing matters in connection with process and MH's interim rates to be effective April 1, 2010.

Eight topics were addressed by the participants at the PHC as follows:

1.      Intervener request by the NYC;

2.      Intervener request by SCO;

March 26, 2010
Order No. 30/10
Page 3 of 53

3.     Scope of risk and risk management review;

4.     Timetable for the revenue requirement, cost of service, rate design, risk and risk management;

5.     Terms of reference for the independent experts;

6.     April 1, 2010 interim rates – review of rate schedule from Order 18/10;

7.     Energy intensive industrial rate;

8.     Diesel zone rate application.

Counsel for the Board circulated these topics to counsel for MH, counsel for the existing interveners and counsel/representatives of the prospective interveners as well as to counsel for the independent experts to provide them with notice of the topics to be reviewed by the Board at the PHC.

Notice of the PHC was given to all existing interveners or their counsel and the new intervener applicants. Participation at the March 12, 2010 PHC included in person attendance by counsel for Consumers' Association of Canada (Manitoba) Inc. and Manitoba Society of Seniors (CAC/MSOS), Manitoba Industrial Power Users Group (MIPUG), Resource Conservation Manitoba and Time to Respect Earth's Ecosystems (RCM/TREE), City of Winnipeg, and counsel for the independent experts, Drs. Kubursi and Magee.

In attendance by teleconference at the March 12, 2010 PHC were the NYC acting on its own behalf, and counsel for SCO.

A transcript of the proceedings of the March 12, 2010 PHC is available on the Board's website at www.pub.gov.mb.ca.

March 26, 2010
Order No. 30/10
Page 4 of 53

Also found on the Board's website are the previous Orders issued by the Board in this GRA, including the first procedural Order 17/10 and the interim rates Order 18/10.

Pursuant to directions of the Board at the oral hearing, the Board received written submissions from certain interveners on matters deferred from the oral PHC involving terms of reference of the independent experts and the revised timetable.

As a result, MIPUG made written submissions on March 17, 2010 addressing the terms of reference of the independent experts and the revised timetable, as well as a structure for the proposed MH workshop.  RCM / TREE made written submissions on March 19, 2010 addressing the terms of reference of the independent experts.  CAC/MSOS made written submissions on March 22, 2010 addressing the revised timetable.  Finally, MH made written submissions on March 22, 2010 addressing the terms of reference of the independent experts, the revised timetable, and the structure for the proposed MH workshop.

All of these written submissions have been reviewed and considered by the Board in its deliberations leading to this Order.


## 2.0    New York Consultant's Intervener Application

A New York Consultant (NYC) filed an intervener application in original and redacted form, seeking intervener status in respect of the risk review portion of the MH GRA.

The Board circulated the redacted version of the NYC intervener application to all existing interveners in advance of the March 12, 2010 hearing.  The NYC intervener application was also provided to counsel for the independent experts and counsel for the remaining intervener applicant, SCO.

March 26, 2010
Order No. 30/10
Page 5 of 53

The Board determined that, pursuant to the request of the NYC, the original intervener application would not be placed on the public record, but only the application in its redacted form would be publicly available.  The Board further determined that the identity of the NYC would remain confidential for the purposes of the intervener application and related submissions. All participants referred to this applicant as the New York Consultant.

With regard to the maintenance of confidentiality of this intervener applicant, only MH objected to the confidentiality.

The Board has knowledge of the identity of this applicant having received the original application, and has satisfied itself as to the existence of the entity and principal of the applicant.

It is also clear that MH, the GRA applicant in this rate hearing, is well aware of the identity and background of the NYC, as this is the same entity retained by MH for various risk related projects/studies from 2004 through 2008.

In addition to the intervener application form, the NYC filed with the Board a 36 page letter which, although it did not specifically reference the intervention application, did in part address certain procedural issues and concepts respecting the risk review to be conducted by the Board.

The Board reviewed the letter and determined that it was not relevant to the application for intervener status by the NYC.  The letter was not circulated by the Board for review or comment, and does not form part of the Board's record for purposes of this Order.

## 2.1      Submissions of the NYC

The NYC attended by conference call to participate in the PHC of March 12, 2010 and make oral submissions with respect to the topics under review, as previously circulated by Board counsel.

The NYC addressed background matters leading to its intervener application. The NYC confirmed that it had made a disclosure to the Manitoba Ombudsman under *The Public Interest Disclosure (Whistleblower Protection) Act* in December, 2008 regarding information affecting MH's risks which, the NYC says, would have direct consequences to the Utility's ratepayers.

In or about March, 2009, the NYC says that it made inquiries of the Board regarding filing of a disclosure with the Board on these same matters. Also at this time, the NYC states that the Auditor General of Manitoba took over the preliminary investigation of the disclosure to the Ombudsman and review of the materials as provided by the NYC.

The NYC says that although several hundreds of hours were volunteered by the consultant in assisting both the Manitoba Ombudsman and Auditor General offices to comprehend the materials supporting the disclosure, nothing occurred to advance either investigation for several months. The NYC states that in October, 2009, it became aware that the Manitoba government had ordered a special audit of MH related to these matters. To the knowledge of the NYC, nothing further transpired respecting this special audit announcement.

Meanwhile, the NYC states that, in November, 2009, responsibility for the investigation was transferred from the Auditor General back to the Ombudsman.

On December 22, 2009, the NYC was served with court papers respecting MH's Manitoba Court of Queen's Bench application dealing with a report commissioned by MH from KPMG, which the NYC assumed was related to the start of a KPMG review by MH.

Finally, the NYC says it was advised in February or March, 2010 by the Ombudsman that the investigation was being transferred over to the Public Utilities Board and that the investigation would proceed under the auspices of the Board.

As a result of all of these developments and after consulting with Board staff and Board counsel, the NYC chose to seek intervener status to participate in the Board's current process which was to include a comprehensive review of the risk management processes and risks of MH.

The NYC summarized its grounds for intervention in its written application form and touched upon these points in its oral submission.  The NYC indicated that a conclusion from its studies produced for MH in 2006 to 2008 demonstrated that the GRA is based upon inaccurate forecasts and flawed assessment of risk, affecting the Manitoba ratepayer.

Further, the NYC says that it can address the risks to the Utility and impact of risks on the integrated financial forecast (IFF) of MH, as contemplated by the Board in Order 17/10.  The magnitude of risks, the consultant says, has a direct consequence to financial forecasts and is of an order of magnitude that could exceed retained earnings of MH and has a sizeable impact on the debt/equity ratio of the Utility.

Further, the NYC says it can address past losses by MH exceeding $1.1 billion that have been borne by ratepayers and need to be understood.

Other grounds the NYC refers to include the need for the Board to understand comprehensively the correct Risk Capital and Tolerances of MH as it expands its market in MISO and as MH looks to set long term contracts for sale of electricity to fiscal year 2032.

The NYC can address risks to reliability and safety which have a sizeable impact on the operations of MH's reservoirs and, again, for revenue requirements for ratepayers.

In addressing costs, the NYC says that the inordinate delay of the investigation, as outlined in the NYC's background remarks relating to the Ombudsman and Auditor General, have led to the current need for the consultant to spend time to review and prepare for its participation in the Board's process.  Moreover, the NYC states that it has already devoted hundreds of volunteer

March 26, 2010
Order No. 30/10
Page 8 of 53

hours to these Provincial authorities, and that the consultant had a window of opportunity during a leave by its principal to devote time in 2009 to these matters. Now, says the NYC, with other projects pending, and also the lost opportunity cost of its current time, which may be required as an intervener, need to be managed, and current time spent should be reasonably compensated. To this end, the NYC has outlined its own consulting costs component for Phase I of its participation including review and preparation at approximately $50,000.00. Further, the NYC asserts that it will require support from computer programmers and a PhD analyst in its preparations and review.

The NYC has also outlined significant legal costs, including a request for the following:

- Required Litigation and Indemnification of Legal QB Costs: **$125,000 ($25,000 CDN, and $150,000 USD) [sic].

- Litigation Insurance and Indemnification Costs:  $300,000 USD** important ($75,000 deposit required)

- Indemnification Deposit Retainer: $75,000 (Costs to be itemized** Litigation Insurance requirements)

- Canadian Legal Costs:  undetermined: Estimated at $50,000 CDN ($25,000 CDN deposit required)

  **All costs for legal counsel will be required [as retainers] in advance.

In connection with its legal costs coverage, the NYC urged the Board to take steps to end the Queen's Bench application brought by MH. The end to the "legal wrangling", as the consultant put it, is a necessary precondition to the NYC's participation in the Board's risk review process. The NYC wishes to cooperate, but says it cannot deal with both matters going forward at this time.

In respect of its costs submission, the NYC made it clear that, while it would try to fix the cap on consulting costs reimbursement, in principle the request being made by the NYC is for a guarantee of full consulting and legal fees reimbursement, including an upfront/installment payment of costs at various phases of work, and including indemnification assurances.

Although not directly the subject matter of the intervener application, the NYC addressed the pending KPMG report.  The NYC noted that KPMG did not speak with NYC regarding issues raised by the NYC in reports prepared for MH, and to be addressed in the KPMG report.  The author of the reports therefore had no "airtime" with KPMG, and KPMG has likely had a lot of time with MH representatives to explain their side of the matter.

The NYC says that as a result, the KPMG report will have little if any value.

The NYC reviewed the Board's rules of practice and procedure, which in its view support the intervener application.  The NYC believes it meets the Board's criteria to intervene, that the Board may allow costs as requested, and that the Board may use flexibility in setting the process for any particular matter, contrary to its regular existing practices, as the circumstances require.

Finally, the NYC states that any publication or review of its reports can only occur with the consultant's redactions being made and accepted by the Board.  The NYC objects to any of its reports being placed on the record at this proceeding unless it can redact them to protect confidential information pursuant to Rule 13 of the Board's Rules of Practice and Procedure.

The NYC may also be willing to allow the independent experts to review its computer model which supports the consultant's findings, but only on a confidential basis and pursuant to a non-disclosure agreement (NDA) such that the independent experts may perform a technical audit of the NYC's calculations, but without the right for the independent experts to make any public disclosure thereafter, save to confirm in general the accuracy of the findings of the NYC.  The

confidential review would be done in New York as the consultant indicates that it does not wish to be bound by Manitoba jurisdiction.

The NYC makes clear that it stands 100% behind its work and its conclusions as presented to MH.  The NYC seeks to protect its trade secrets and proprietary information.

The NYC also had an opportunity to speak by way of reply to the submissions of the other Interveners, and also the submissions of SCO and MH.  In reply, the NYC noted that if its reports are to be placed on the record in any form, the NYC must be allowed to have a voice in the process in order to defend and respond to the reports.  The NYC says that procedural fairness requires this, as compared to a process that would see the Consultant's findings or its conclusions being advanced through the independent experts.

Further, the NYC reiterated its initial submissions with respect to the impediments which have been caused by MH and which continue to block the NYC in cooperating further with the Board.  The NYC again referred to the Board's Rules of Practice and Procedure and its ability to modify its processes in this unprecedented risk review process.

## 2.2     Submissions of CAC/MSOS

CAC/MSOS submits that the intervener application of the NYC be denied.  By way of general preliminary comments, CAC/MSOS notes that this process and matters related thereto are unprecedented both in scope and in procedural issues or matters for determination by the Board.  CAC/MSOS points to the need for this further PHC, being the third PHC as one example of the qualitative differences present in this GRA.

CAC/MSOS states, with emphasis, that at issue in this process is a rate application.   The question, says CAC/MSOS, is whether the rates proposed by MH are "just and reasonable".

Risk issues are central to this, says CAC/MSOS, and are matters that have been of great concern to the Board since at least 2003-04.

Also of note, says CAC/MSOS, is the appointment of independent experts by the Board to examine risk issues related to MH.  Further, and by way of background, CAC/MSOS states that the NYC appears to have produced five documents for MH between 2004 to 2008, at least some of which may deal with risk measurements and standards, risk monitoring and system requirements, a risk map to better allow MH to diagnose and manage its risk profile, and related recommendations.  The documents also appear to address MH's long term export contracts and issues relating to hydraulics.

CAC/MSOS notes that no one other than MH had access to those documents, and therefore CAC/MSOS's ability to address these issues is limited.  It cannot specifically address the nature and import of conclusions reached by the NYC.

CAC/MSOS takes no view of the merits of the NYC position.  It acknowledges however that serious concerns have been raised.

CAC/MSOS notes that the NYC's intervention application is extensive, involving a number of expert witnesses and a number of MH witnesses.  It also notes the legal and financial impediments faced by the NYC, and comments that the NYC's suggested technical audit process may not be a fit with the Board's usual public process.

CAC/MSOS reminds the Board of the need for transparency, to satisfy the public that its deliberations and decisions are being made openly.

CAC/MSOS has fielded calls from consumers which indicate that these matters relating to risk concerns have undermined the confidence of some consumers in the reliability of MH's forecasts and the prudence of management of MH's operations.  CAC/MSOS suggests that the role for the

NYC is properly that of an "informant", whereby it will assist the Board via the independent experts, Drs. Kubursi and Magee, by informing them of its conclusions and by providing scoping assistance on risk issues that relate to rates.

To achieve this end, submits CAC/MSOS, the independent experts should meet with the NYC and obtain the benefit of its analytical and empirical findings at a high level.  This more limited role for the NYC, suggests CAC/MSOS, will assist this independent regulatory process, including the independent experts, to draw appropriate conclusions after a thorough vigorous investigation.

Limiting the role of the NYC will also likely have the benefit, CAC/MSOS says, of restricting the NYC's exposure and therefore mitigating its litigation risk which is clearly of great concern to the NYC.

CAC/MSOS as noted, does not support the NYC in the traditional intervener role.  The NYC does not operate in Manitoba and does not pay utility rates in Manitoba.  CAC/MSOS suggests that the NYC does not have a direct interest in the outcome of the rate application and that the clearing of one's professional name is not sufficient to establish such an interest (though CAC/MSOS does not challenge the bona fides of the NYC in its desire to do so).  The NYC does not purport to represent any segment of Manitoba consumers.

As a result a more limited role as proposed by CAC/MSOS brings more efficiency to the process and less risk to the consultant.  Further CAC/MSOS is concerned that a battle within the GRA process between MH and the NYC may overshadow or sideline the key matters of risk review, and may waste scarce resources, if the role requested by the NYC within a broad scope is permitted.

CAC/MSOS states that it may be open to the Board at a later stage to grant a larger role to the NYC, if the Board determines such is warranted.

With regard to the five documents prepared by the NYC and previously filed by MH with the Board in confidence in accordance with the Board directive in Order 32/09, CAC/MSOS requests that a process be defined by the Board, with deadlines, to resolve the redaction issues as between MH and the NYC. This will allow the documents in their redacted form to be put on the record.

Failing resolution the Board should require MH to make submissions as to why to the documents should not be tabled in this process. CAC/MSOS is prepared to file its own motion for production of the document if so required. The NYC should also have a time limited period to seek redactions.

CAC/MSOS suggests that an immediate process be established so that the redacted five documents can be tabled by April 1, 2010.

CAC/MSOS further submits that the NYC's reasonable costs respecting its role and respecting its redaction requests should be paid within the GRA.

## 2.3     Submission of MIPUG

MIPUG opposes the NYC's request for intervener status. MIPUG argues that the NYC is a person having no interest in the outcome of the rate hearing and also not representing any segment of the Manitoba population. MIPUG states that this consultant cannot be considered an independent expert to the extent that it wishes to defend the credibility of its conclusions as contained in its reports previously prepared for MH. MIPUG suggests that the scope of the risk issues need to be identified, and then the Board can determine the extent, if any, to which it must consider the NYC's reports.

MIPUG agrees with CAC/MSOS that the focus of this proceeding is rates and not whether MH or the NYC is right or wrong.

MIPUG notes that the Board has hired independent experts and further it has already granted intervener status to a number of parties who are capable of representing Manitobans, from their own perspective, as to what constitutes fair and reasonable rates.

As to the five NYC reports, MIPUG notes that they have already been filed by MH with the Board in compliance with a prior Board directive.  The Board may release those documents, quite apart from what is happening in other proceedings.  Further, parties may bring a motion to compel documents and the Board has the power of subpoena.

What is important, asserts MIPUG, is that the parties have an ability to consider the content of the documents and to support or challenge the findings as they choose, on a principled basis.

Finally, MIPUG cautions against a redaction process for these five documents which may result in so much content being deleted that the documents are not useful.

As to costs, MIPUG submits that the Board's rules provide no basis to grant costs for an intervener's own time, as compared to a consultant retained by an intervener.

## 2.4     Submissions of RCM/TREE

RCM/TREE opposes the granting of intervener status to the NYC, for the same reasons as stated by CAC/MSOS and MIPUG.

RCM/TREE supports the concept of a limited role for the NYC, whereby the independent experts could meet with the NYC to review its reports, on an informal basis, so that the independent experts could ensure that the identified issues are brought forward and tested in the Board's GRA process.

Through the independent experts, RCM/TREE suggests that all interveners will have access to the information conveyed and an opportunity to raise issues with the independent experts. This will satisfy the requirement, submits RCM/TREE, of putting all proper concerns before the Board for investigation.

**2.5    Submission of the City of Winnipeg**

The City of Winnipeg takes no position on the intervener application of the NYC.

**2.6    Submission of SCO**

SCO takes no position on the intervener application of the NYC.

**2.7    Submission of Independent Experts**

Counsel for the independent experts confirmed that their clients take no position on the NYC's application for intervention status.

**2.8    Submission of MH**

MH opposes granting of intervener status to the NYC. MH states that on application of the Board's Rules of Practice and Procedure, the NYC cannot be granted intervener status. The NYC has no interest in the outcome of the proceedings, as it is not affected by rates charged by MH, which is the subject matter of the proceeding.

MH submits that the role of the PUB is not to adjudicate disputes between parties. If the intention of the NYC is to establish the validity of its reports arising from contracts as between the NYC and MH, that is insufficient to ground intervener status.

MH takes the view that the Board's role is not to resolve a dispute as between MH and its former consultant. Rather, the Board's role is to determine rates which are in the public interest and to balance the financial stability of the Utility with the needs of ratepayers.

In response to the request of the NYC to the Board to strike out the Queen's Bench Application of MH, MH submits that, what it seeks from the Court is an order to ensure that the complete KPMG report can be shared in this proceeding. MH offered that if the Board issues a subpoena for production of the KPMG report, MH may well be able to discontinue its application. When questioned by the Vice Chair on the offer, MH's counsel indicated that while MH may have to review this point for a definitive response, a subpoena would solve the court matter with respect to the PUB, and perhaps the whole Court Application.

MH acknowledges that risks faced by the corporation will be part of this review, including concerns raised by the NYC that are material to rates. However, MH rejects the process for technical audits suggested by the NYC.

MH further states that past Board rulings establish the requirement for an intervener to demonstrate a substantial interest in the outcome of a proceeding and further that the intervener represent a substantial number of ratepayers. MH provided specific citations from past rulings in support of its position.

MH also noted a number of deficiencies in the NYC's intervention application form. MH notes that the redacted version of the form fails to disclose the party seeking status, and its contact information. MH submits that the request for confidential filing by the NYC, which it alleges has been submitted without supporting reasons for such request, raises concerns procedurally and legally. Therefore MH says the application must be rejected on this ground.

MH notes that there is potential for significant mischief in this regard, since Section 15(3) of *The Public Utilities Board Act* requires the taking of evidence in public.

MH also notes that the costs request by the NYC is deficient. In addition, MH submits that the Board has no jurisdiction to grant legal costs or indemnification to the NYC respecting the Queen's Bench Application. MH states that the request for U.S. counsel costs is not relevant to this proceeding, and submits that the potential for abuse in seeking such costs is evident.

MH states that the consultant's costs for redacting reports, and review and preparation really support the NYC's goal of validating and justifying its previous work for MH in the Board's forum. The debate, says MH, should not be about MH versus the NYC, but rather the Board should identify the issues that could have a material impact on rates and ensure that its decisions are based on well tested evidence. Further, MH points out that the Board's rules do not allow an intervener to be directly reimbursed for its own time spent.

MH submits that the timeframe proposed by the NYC will also unnecessarily delay the GRA proceeding.

MH states that costs may not be guaranteed or paid in advance to an intervener, as sought by the NYC. MH cites the provision of Board Rule 43(1) in support of its position, as determination of allowable costs is intended to follow conclusion of a proceeding and an assessment as to the intervener's contribution to the proceeding amongst other criteria. On this point, MH refers the Board to a Manitoba Court of Appeal ruling which supports its argument in this respect.

MH, however, acknowledges that there may be a role for the NYC in the process. MH suggests that the NYC ought to be able to inform the Board's decision as to the scope of the risk review, along with the interveners and their experts, MH and its experts and the independent experts. In

this way, MH argues, the NYC would not be obliged to disclose its identity and its alleged confidential information.

MH is concerned that the rate hearing be conducted in a transparent way to support public confidence in the review. Procedural fairness, asserts MH, means no private meetings. Everything is done in an open process with witnesses subject to cross-examination. As to the reports prepared by the NYC which have been filed by MH with the PUB, in confidence, MH suggests that as long as there are no impediments placed in its way and with only a few redactions, MH is prepared to place these reports on the record of this proceeding.

MH cautions however that these are unsworn and untested documents and that use of the information must be determined based upon the further processes established, including whether the author will testify in relation to the reports.

MH is concerned about the process which would be used to allow the independent experts confidential access to the NYC in New York to review its analytical and empirical findings, as suggested by one of the other interveners. MH urges the Board to establish a very narrow and well defined scope of any such meeting, and to carefully control any such closed door process. MH would seek to have the process documented, so all participants can see what happened.

## 3.0     SCO Intervention Application

SCO submitted its intervention application to the Board on March 8, 2010. The form as filed consists of the Board's standard intervener request form and costs budget, along with attachments including Schedule "A" which is a submission of SCO's reasons supporting intervention; Schedule "B" which is a submission on the reasons for SCO's delay in seeking status in the process; a document identified as Exhibit 48 to the Affidavit of Andrew David

Cormie sworn February 18, 2010; and a summary report of Robert McCullough of McCullough Research.

The Board circulated the SCO's intervener application to MH, all existing interveners, the NYC and to counsel for the independent experts.  The Board has determined that Exhibit 48 and the McCullough summary report is not relevant to the intervener application and does not rely on that attachment for the purposes of this Order.  The Board makes no ruling at this time on the ability of SCO to use that document in this process.

### 3.1    SCO's Intervention Submission

SCO submits that it brings a unique perspective to the hearing on behalf of 36 southern Manitoba First Nations which have not been adequately addressed in any of the interventions thus far. These First Nations, as ratepayers and as parties with riparian interests in land that will be impacted by MH's water regime, have a unique perspective to voice in the GRA.  SCO submits that until Exhibit 48 to the Cormie Affidavit was made public, MH had asserted that rates, profits and risks were not related.  SCO states that Exhibit 48 illustrates the inter connection of MH rates, profits and risk.

SCO says therefore, that it is now viable for SCO to pursue issues and to participate as an intervener on the following matters:

> Descriptions and uses of HERMES and SPLASH in modeling and forecasting inflows, stream flows, reservoir levels, and draw downs of Lake Winnipeg; drought; revenues; hydraulic operations and risk management practices vis-à-vis exports to the U.S.

SCO intends to work in the proper spirit of intervention.  It intends to work cooperatively with other interveners and to avoid duplication.

SCO wishes to put forward evidence so that the Board can fully understand the perspective of these First Nations and potential future liabilities for MH respecting its risk management affecting SCO on a broad range of issues, including possible environmental impacts.

SCO notes that the NYC, both in its submissions under issue one and again in its submission on the SCO intervention, suggests that SCO has improperly received and used confidential information found in Exhibit 48 to the Cormie Affidavit, and that the Board should not allow it to be considered in the proceedings.

SCO submits that Exhibit 48 is a public document filed in the MH Queen's Bench Application, in the form attached to its intervener application and is therefore a document properly available to the public.

Further, SCO states that Exhibit 48 has been disseminated in the public domain, the evidence for which is found in Hansard, from the Legislative Assembly of Manitoba Standing Committee on Crown Corporations dated Monday, March 8, 2010.  Exhibit 48 and the Cormie Affidavit are shown therein to be part of the public record of discussion.

Finally SCO submits that in accordance with the Board's rules, the NYC should have brought a motion to address its concerns which, given the current state of facts, the SCO says are extraordinary.

With respect to SCO's costs submission, SCO seeks to adjust its application based upon the Board's tariff for allowable legal and consulting fees, which SCO only received after its submission was filed.  SCO repeats that it will work efficiently and will avoid duplication.  SCO notes that its cost proposal does not take into account an extended hearing in two segments, and seeks flexibility such that reasonable costs incurred, as the hearing finally unfolds, can be submitted for review and approval.

**3.2    MH Submission**

MH opposes the intervention request of SCO.   MH says that the concerns of the SCO membership are already represented by CAC/MSOS, since this is a rate hearing.

MH asserts that the McCullough summary report is an interpretation of the NYC's findings, drawn from Exhibit 48 of the Cormie Affidavit, and that such information, if reviewed, is best reviewed at its source.

MH states that the risk analysis here, related to hydraulics, involves impacts on the financial position of the utility.   Such a review is not to look at physical levels of water and effects on riparian interests, one of the grounds advanced by SCO to support its participation.   Since the focus is on the financial health of the utility and rate impacts, MH says that SCO's involvement will not differ from that of CAC/MSOS.

**3.3    CAC/MSOS Submission**

CAC/MSOS has no objection to SCO's application and welcomes its participation.   CAC/MSOS notes that costs issues will need to be considered as the matter proceeds, and that duplication be avoided where possible.

**3.4    MIPUG Submission**

MIPUG agrees with the submission of CAC/MSOS with regard to the SCO intervention and has no objection.

**3.5    RCM/TREE Submission**

RCM/TREE agrees with the submissions of CAC/MSOS with regard to the SCO intervention and has no objection.

**3.6     City of Winnipeg Submission**

City of Winnipeg has no objection to the SCO application.

**3.7     Independent Experts Submission**

The independent experts take no position on this intervention request.

**3.8     NYC Submission**

The NYC voices no objection to SCO's intervention request.  The NYC does object to SCO putting on the record, as part of its intervener application materials, Exhibit 48 of the Cormie Affidavit and the McCullough summary report as those documents contain the NYC's work. The NYC suggests that the Board require removal of the documents as presented.  The NYC suggests that its confidential information should be protected.  The NYC says that upon a proper process, its original works may be available, and it will want to speak to its work as part of the process.  Such involvement would include the ability of the NYC to call its own experts and witnesses.

## 4.0    Scope of Risk Review

### 4.1    MIPUG Submission

MIPUG urges the Board to refine the scope of its risk review in the GRA, although MIPUG has not determined if it will participate in the risk review aspect of the process.

MIPUG is concerned that time, resources and expense may be wasted if the risk review is not focused.  MIPUG suggests that the Board attempt in this process to review the most important issues, and any secondary risk issues not examined in this process can be examined in subsequent hearings.

MIPUG referred the Board to its first procedural Order 17/10, and quoted the subject areas of risk mentioned therein.  MIPUG also circulated at the PHC a scoping issues document, which had been provided to a meeting of interveners, counsel and Board staff on February 19, 2010.

The document which is transcribed into the record of the March 12, 2010 PHC was presented by MIPUG as a suggested approach, with four central questions grounding the scope for risk review including:

(1)    Does Hydro have the required capabilities, internal organization, qualified staff, policies and procedures and oversight and governance structures needed to appropriately manage the noted risk; can they be improved, modified or adapted to reduce the risk exposure imposed on ratepayers;

(2)    Is Hydro's approach to risk management appropriate for a Crown owned regulated public utility;

(3)    Do Hydro's decision making criteria reflect a risk reward tolerance criteria that is acceptable to Hydro's ratepayers and the Board; and

(4)     Where risk exposure cannot be modified or addressed through other appropriate risk management practices, what are the financial reserves required to be targeted to address the residual risk items.

MIPUG submits that the Board set out a scope which identifies items and questions it is interested in getting answered and the types of orders it anticipates may flow from the proceeding.  It is possible that a draft of such a document could be circulated for review and comment by participants to the proceeding.

Finally, once the scope is refined, MIPUG suggests it may be useful for MH to put on a general information workshop to deal with certain matters so as to put all participants on the same level of understanding.

## 4.2     MH Submission

MH shares MIPUG's view that the Board must establish an efficient framework for the risk review aimed at promoting the interests of ratepayers.  MH states that an unproductive and unrestrained process will be of minimal value.  Although MH's initial GRA filing did not contemplate that a comprehensive risk review, as directed in Order 17/10, would occur, some of its materials do address risk.  MH sees more focus on this area as essential, so that it can assess the case it needs to meet and so that it can file the materials required to address those issues.

MH states that there may be a fundamental misunderstanding of some participants in this process regarding MH's business activities.  MH proposes to conduct a general information workshop as mentioned by MIPUG, to share information with interveners, counsel, Board staff and Panel Members, respecting MH's system operations, system planning and its long term export strategy. MH sees this as a benefit to all participants and to the Board, and such in its view will enhance the process for the risk review.

March 26, 2010
Order No. 30/10
Page 25 of 53

MH identifies three questions which the Board may consider in defining the scope including:

(1)     Identification and review of the policies and procedures and oversight in governance structures in place to manage identified risks.  Are they reasonable in the context of the associated risk?

(2)     Is MH's approach to risk management appropriate in the context of the objects and purposes of The *Manitoba Hydro Act*?

(3)     Does MH's decision making criteria reflect a reasonable risk/reward tolerance taking into account the consideration of the interests of its stakeholders?

MH suggests that it is still premature to examine risks associated with the commitment to new plant, as MH expects there will be a separate review process for any new major generation. However MH agrees that assessment of risk within the context of its current planning program for future major capital expenditures is appropriate.

**4.3     CAC/MSOS Submission**

CAC/MSOS presents its own written proposal as to the refinement of scope respecting the risk review, which has been transcribed into the record of the March 12, 2010 hearing.

CAC/MSOS suggests that the risk review should identify material financial and operational risks and opportunities.  These risks must be identified by actual and relative magnitude so that the process focuses on the big issues.  CAC/MSOS says the review should also examine, as suggested by MIPUG, whether MH's current risk management tools meet the test of reasonableness and prudence as they affect rates.

CAC/MSOS also suggested that risk management best practices be identified, and that risk tolerances be considered both for retained earnings and also for rates.  CAC/MSOS also notes

that issues raised by the NYC, for example respecting computer software systems used by MH, should be considered within the scope of this risk review.  Further elaboration of CAC/MSOS's proposal is contained in its written submission.

## 4.4     RCM/TREE Submission

RCM/TREE supports further refinement of the scope for risk review which will allow a more distinct focus for efficiency of the process.

RCM/TREE also strongly supports the MH workshop proposal, and sees this as a great benefit to all, even affording the possibility that some types of questions will be answered in that format thus streamlining the GRA itself.

## 4.5     City of Winnipeg Submission

The City had no comment on the scope of risk review.

## 4.6     Independent Experts Submission

The independent experts would welcome refinement of scope.  Counsel for the independent experts also took this opportunity to address the possibility at the independent experts meeting with the NYC, as contemplated by earlier submissions in the March 12, 2010 PHC.  The independent experts submit that it is extremely important that they remain independent in all respects.  The independent experts therefore stress that any meetings to take place with them are for information exchange or data exchange purposes only, as opposed to providing opinions on the information received or making arguments in support of any existing position.

**4.7     NYC Submission**

The NYC stated that it had provided process suggestions to the Board in its March 8th letter. The NYC commented that a technical workshop may be made available by someone for the NYC and the experts it wishes to bring on board.  The NYC notes that these decisions are yet to be made, and are affected by the Board's ruling on the role of the NYC and the refinement of the scope for risk review.

Finally, the NYC repeats that in fairness, for the NYC to properly participate and defend its reports, it must have access, in a process as structured by the Board, to MH employees who can assist in supplying and addressing the necessary supporting facts and findings by the NYC.

**4.8     SCO Submission**

SCO seeks to ensure that the risk review has the broadest scope possible respecting MH's potential liabilities, given the factual context whereby a dispute is ongoing between MH and its former consultant, and with a new expert retained by MH to examine and potentially repudiate several years of work of the former consultant.

SCO also seeks to consider the concept of an environmental audit within the risk analysis to examine MH's assessment of its potential liabilities and its risk planning on this subject.  From SCO's perspective, this requires assessment in the context of the unique circumstances of each individual First Nation in its membership, based on particular impacts by MH's operations and its alleged mis-management of its water regime to date.

## 5.0    Timetable for Hearing

The Board directed that revision to the timetables be considered with interveners and counsel to achieve a consensus if possible.  As noted herein, written submissions were received and considered by the Board after the oral PHC regarding timetable revision issues.

## 6.0    Terms of Reference for Independent Experts

The Board directed that all participants submit their specific comments regarding any suggested changes to the terms of reference for the independent experts in writing to Board counsel.  As noted herein, written submissions were received and considered by the Board after the oral PHC regarding the proposed terms of reference.

## 7.0    Interim Rate Schedule

### 7.1    CAC/MSOS Submission

CAC/MSOS submits that it may be more equitable to distribute the interim rate increase issued in Order 18/10 equally over the first and second blocks of energy consumption, rather than load the increase in the second block as proposed by MH.

CAC/MSOS notes that some customers do not have access to DSM programming, for example, and they may suffer higher rates without an ability to make alternative choices.  CAC/MSOS suggests some First Nations people living in remote communities may fall into this category.  As a result, CAC/MSOS submits that the rate be adjusted to distribute the increase evenly over the rate blocks.

### 7.2     MIPUG Submission

MIPUG has no comment on the interim rate schedule.

### 7.3     RCM/TREE Submission

RCM/TREE notes that the interim rate schedule published in Order 18/10 is in accordance with what RCM/TREE had originally proposed and it therefore supports the schedule as currently set by MH.

### 7.4     City of Winnipeg Submission

The City is satisfied with the interim rate schedule and no changes are suggested.

### 7.5     MH Submission

MH filed the rate schedule as published in Order 18/10 based on its understanding of the Board's direction.  MH remains flexible as to further directions of the Board respecting the final interim rate schedule.

## 8.0     Energy Intensive Industrial Rate

MH reported to the Board that, though it has filed an EIIR Application, the Application is currently on hold while MH continues to consult with customers impacted by the proposal.  MH has also agreed to meet with MIPUG to discuss MIPUG's concerns.  RCM/TREE has also requested it be consulted by MH.  MH intends to inform the Board, in due course, of any modifications required to the Application as a result of these consultations and will therefore provide these modifications prior to requesting that the Board's review process be commenced.

## 9.0    Diesel Zone Rate Application

MH reports to the Board that it has been engaging in discussions with INAC and the diesel First Nations on subject matter which could impact MH's proposed Diesel Zone Rate Application.  As a result, MH has not filed that Application but expects that it will be filed very soon.

## 10.0    Board Findings

### 10.1    NYC Intervention and Risk Reports

The Board has determined that intervener status will not be granted to the NYC, but that a different role to assist and inform the Board in the risk review process, as outlined herein, will be of benefit to the Board in this process.

Since the NYC's disclosure to the Ombudsman of Manitoba under *The Public Interest Disclosure (Whistleblower Protection) Act* in December 2008, the New York consultant has been seeking to have its concerns respecting MH's risk issues and impacts investigated.  There has been some degree of delay in the investigations that began with the Ombudsman and the Manitoba Auditor General's Office (which processes are not within the Board's control), and it is clear to the Board, and no doubt to the public at large, that there is a great deal of acrimony between MH and its former consultant.

The Board's jurisdiction derives from *The Public Utilities Board Act* of Manitoba and *The Crown Corporations Public Review and Accountability Act*, in connection with regulatory responsibility for MH.  As a result, it is not possible for the Ombudsman or the Auditor General to transfer their investigations to the Board, although this may have appeared to be the process to

the NYC.  The Board is also not governed or bound by *The Public Interest Disclosure (Whistleblower Protection) Act* in the completion of its statutory responsibilities.

As outlined and detailed in Order 17/10, the Board has decided to conduct a comprehensive review of risks at MH.  The Board will include in its investigation the reports of the NYC prepared for MH, and sees as valuable the potential contributions and information to be provided to the independent experts appointed by the Board via the NYC as to the NYC's findings and conclusions. The Board is motivated to conduct a comprehensive risk review not only by recent revelations of the NYC and matters relating thereto, but also based upon a series of prior longstanding Board concerns as outlined in Board orders and directives wherein the Board, for some time, has identified a need for greater examination of risks faced by the Utility.

The Board accepts the submissions of the NYC that it wishes to assist in advancing the Board's understanding of risk matters.  The Board is grateful that the NYC is willing to cooperate and therefore defines a role and a process which the Board believes will achieve a useful contribution by the NYC to the Board's review of MH's risks, while respecting the principles that have governed the traditional role of interveners in past processes.  The participation, as defined herein, also has the benefit of limiting concerns of legal exposure of the NYC, reduces cost, and allows the process to be completed in a timely and effective way, within the current proposed GRA schedule, all to an end which will allow the Board to complete the GRA in 2010.

It is unfortunate that the delays in previous investigations have caused the NYC to require significant time, resources and costs to be properly prepared for full intervention.  While the Board is not responsible for those delays, it fully accepts the submission that the NYC would require extensive professional time to fully recover the background detail which underlies its work.  The proposal outlined by the NYC and its intervention application adds significant

March 26, 2010
Order No. 30/10
Page 32 of 53

additional cost to this process.  The Board must consider the burden of these proposed costs in the overall scheme of the GRA in general and the risk review in particular.

The Board has considered and adopts the submissions of a CAC/MSOS, MIPUG and MH with regard to the traditional role of an intervener and the criteria upon which the Board should consider intervention.  The Board accepts that it should apply the standard criteria in determining that the traditional intervener status, accorded in prior hearings before the Board, is not the appropriate role for the NYC.

The Board is also mindful that an apparent intention of the NYC to defend its reputation and to substantiate the validity of its conclusions is not the proper basis for intervention.  Likewise, the Board is not proceeding with this risk review to adjudicate any disputes between MH, its former consultant, or any other litigation matters between MH and the NYC or any other entity.  As a further example, the Board's risk review is not the proper forum for examination of specific allegations of liability by First Nations in SCO vis-à-vis alleged property or other damages incurred by any First Nation.

The Board must act within its jurisdiction to set fair and reasonable rates in the GRA by balancing financial health and future financial viability of MH with the needs of consumers.  The Board restates, as found in Order 17/10:

> "A review of the risks faced by MH will proceed as an integral part of the Board's rate review and rate setting jurisdiction.  There are a multitude of risks faced by MH as part of its business activities and plans. … those risks include drought, export markets, interest and exchange rates, labour issues, catastrophic loss of system supply, and changes in accounting standards (IFRS-International Financial Reporting Standards).

March 26, 2010
Order No. 30/10
Page 33 of 53

> The Board must satisfy itself that these and other risks to MH are appropriately managed by the Utility, as part of the Board's rate of approval mandate. The Board also needs to be assured that there are no unreasonable risks "lurking" in the future that, if actualized, are likely to result in undue rate implications for the Utility's Manitoba Consumers.
>
> …The reputation of MH and the confidence of all stakeholders in the Utility is of utmost importance to the Utility and the general public interest."

The scheduling of participation as proposed by the NYC and its timing given its other business commitments, which were made clear to the Board in its submission, are also impediments for intervener participation. Nonetheless, the Board supports a role for the NYC,.

The Board will require MH to file on the record of this proceeding all of the reports prepared for it by the NYC (the NYC Reports), and which are part of a set of 26 reports which MH filed with the Board in November 2009 in response to a prior Board directive. The unredacted reports will be filed in confidence, and MH will at the same time propose, in writing, its redactions of the NYC Reports to the Board.

Once the Board is in receipt of the NYC Reports and the accompanying redaction proposal by MH, it will provide the MH redacted NYC Reports to the NYC and will allow the NYC 1 week from receipt of the MH redacted NYC Reports for the NYC to propose its own redactions in writing to the Board.

The written proposal for redaction by either or both of MH or the NYC will constitute a motion before the Board in this process.

The Board will then circulate the proposed redacted NYC Reports, with the explanation of the nature of the redactions as provided by either or both of MH and / or NYC to all interveners for a

written response.  The Board will then make any required rulings as to the proposed redactions, and the NYC Reports with such redacted changes as required by the Board's Order will be tabled for use.

The Board wishes to make clear that it has no jurisdiction to end the legal wrangling currently occurring in the Manitoba Court of Queen's Bench between MH and the NYC.  The Board also has no jurisdiction to order costs in the Queen's Bench Application.  While the Board does acknowledge the submission of the NYC, that a resolution to the Queen's Bench Application and recovery of the NYC's attendant costs are prerequisites for its role in matters before the Board, the Board is without jurisdiction to make that happen.

The Board will however, subpoena the KPMG Report currently being prepared for MH, and directs MH or its board to notify this Board on the date of completion of the Report in order to allow this Board to take the necessary step.  MH shall provide the original Report and any proposed redactions to the Report upon service of the subpoena.

The Board is mindful that, as with the reports prepared by the NYC for MH, the KPMG Report may contain reference to the NYC's trade secret information.  For that matter, the KPMG Report may also contain some MH information that is commercially sensitive.

Once the Board is in receipt of the KPMG Report from MH, with proposed redactions, it will allow the NYC one week from receipt of the KPMG Report to propose any further redactions in writing to the Board.

The written proposal for redaction of the KPMG Report by either or both of MH or the NYC will constitute a motion before the Board in this process.

The Board will then circulate the proposed redacted KPMG Report, with the explanation of the nature of the redactions as provided by MH and the NYC to all interveners for a written

response. The Board will then make any required rulings as to the proposed redactions, and the KPMG Report with such redacted changes as required by the Board's Order will be tabled for use.

The Board will not intervene in third party contractual disputes, or respond to any alleged use of confidential information of one entity by another entity. This is simply not within the Board's jurisdiction, and such civil remedies as may be available are not an issue in this proceeding and not within the Board's purview.

The Board finds that further delay in completion of the risk review will not be in the public interest. The Board has an existing rate setting mandate pursuant to the MH GRA for the years 2010/2011 and 2011/2012; the public dispute between MH and the former consultant and related issues regarding risk are apparently undermining the public's confidence in the Utility; MH has mammoth expenditures in capital planning on the horizon; and long term export contract commitments are pending, all which signify a need to proceed in a timely way.

From another perspective, the Board notes that the reports prepared by the NYC have already cost MH and its ratepayers approximately $500,000.00. As to further costs incurred to date, the Board notes that MH has expended internal time and resources, fees for external advisors including ICF International and KPMG, and also has incurred fees for external legal counsel, all related to risk review and risk issues. Further, the Board notes that significant costs for this hearing are yet to come, including the fees for the independent experts and possibly consultants or experts for interveners.

These expenditures will be very large in their totality, in comparison to prior MH GRA hearings. CAC/MSOS identified this process as unprecedented, which sentiment was echoed by the NYC. As recounted herein, SCO set the rather extraordinary backdrop of the MH/consultant dispute. This has all occurred in a period following a major drought and resultant losses to the Utility in

2003-04 and is now subject to review in the midst of major decisions to be made by MH regarding long term supply commitments to US customers and major generation infrastructure plans, along with Bi-Pole III construction, all in the cumulative projected range of expenditure of $20 billion.

The Board therefore seeks the cooperation and assistance of the NYC for the purpose of enabling its reports to be placed on the public record in this proceeding, and further seeks the NYC's agreement to meet with and inform the independent experts appointed by the Board as to the NYC's findings and conclusions, which information may form part of the report to be provided by the independent experts to the Board, pursuant to the independent experts' own review and analysis.

To the extent that information shared by the NYC with the independent experts meets the confidentiality criteria in Board Rule 13, the Board recommends to the independent experts and its counsel that an appropriate non-disclosure agreement be arranged with the NYC.

Further and to the extent that the NYC will cooperate and assist the Board in this way, the Board will allow the NYC reasonable consulting costs at the allowable Board rate, and legal fees at the Board rate as necessarily incurred for these purposes. The NYC's participation as proposed is voluntary. The Board will not take steps to force the NYC to participate as outlined.

The NYC's consulting fees will be reviewed on the basis of recorded hours for redaction of reports, but shall not exceed the sum of $16,500.00 (CDN) which is consistent with the NYC's preliminary estimate. Consulting fees for the NYC's preparation and meeting with the independent experts will be reviewed on the basis of recorded hours, but shall not exceed $5,000.00 (CDN).

Legal fees of the consultant associated with preparation of a non-disclosure agreement shall be based on recorded hours at the Board's prescribed rate and shall not exceed $5,000.00 (CDN).

Should the NYC, or the Board, request further involvement by the NYC in any aspect of the risk review, the Board will be prepared to consider additional cost reimbursement, at Board approved rates.

The Board will also indemnify the NYC, but only against all claims of any kind by MH arising from the NYC's participation in this proceeding respecting sharing of information with the independent experts, as part of the process proposed by the Board.

In this way, the NYC findings and conclusions will be available to inform the Board. The Board also has the assurance that it will also have contributions of the independent consultants, MH's consultants, and intervener consultants as brought forward to assess MH's risks.

The Board directs MH to file, with the Board only, the original ICF Report dated September 11, 2009, without redactions, in confidence. MH has already filed a redacted version of the ICF Report on the record of the GRA Proceedings in support of the Application, at Appendix 12.2.

On March 5, 2010, MH filed with the Board and circulated to all parties certain of the reports previously identified in a letter to the Board dated November 6, 2009. The Board has the unredacted versions of all of the documents.

All report redactions proposed by MH are subject to review by the Board and the interveners in the GRA process.

The term "procedural fairness" has been loosely used in submissions at the March 12th PHC. The Board wishes to make clear that it does not owe a duty of procedural fairness to third parties whose information comes before it. Over many years of its function, the Board has received

countless reports without the participation of the authors of those reports, and which the Board has considered in making its regulatory rulings. The Board is willing to entertain motions of third parties if it becomes apparent to third parties that in any form, its competitively sensitive or trade secret information is to be placed on the record. If the Board is convinced that such is contained in a document in any proceeding, the Board will grant redactions to protect that information only, keeping in mind its general process that all information ought to be on the public record with few exceptions.

The Board wishes to make clear that Board Rule 13 is not mandatory and imposes no duty on the Board, since the Board itself created the Rule. Therefore, the Board is always prepared to receive specific motions in order to ensure that the rights of third parties and their specific interest are respected, no matter the nature of the proceeding before it.

Finally, to provide perspective with regard to the myriad of the regulatory responsibilities vested in the Board, the Board wishes to note that confidential filings of any kind are rare; very little information in any of its regulatory proceedings has ever been required to be redacted or has ever been allowed to be filed in confidence.

The Board reaffirms its mandate in this GRA process to conduct an open and transparent hearing, with all evidence to be on the record, and with the only exception being the redactions as described above, and governed by the ruling of the Board upon a specific motion of a participant or an interested third party.

The Board wishes to remind all participants that although the Board is a quasi-judicial body, it is not bound by strict rules of evidence or court precedent. The Board controls its own function and in this context is performing an administrative regulatory rate setting function. The Board can and will consider all information brought before it but is not bound to accept or reject any of the information in setting rates. The public interest in this case is broader than the interests of

any participants at the hearing, and the Board is therefore not limited to consider only the evidence in submissions of the applicant, interveners, independent experts, presenters or others although the participants as a result of this Order and prior Board Order 17/10 provide great breadth of representation of consumers in Manitoba, and the Board fully expects that this will be of great assistance.

**10.2   SCO Intervention**

The Board grants Intervener status to SCO, and accepts the submission of SCO that the organization brings a unique perspective to the examination of risks and risk management in this matter.  The Board acknowledges the submissions of SCO that it plans to work cooperatively and efficiently with other interveners in the ongoing process.

The Board reminds SCO that already in existence and unique in this particular GRA matter is the appointment of independent experts that will carry out a role in accordance with the finalized terms of reference issued by the Board.   To the extent that these independent experts are providing support by informing the Board and all participants, this may allow SCO to reduce its costs.  The determination of the resources that SCO will expend is for its consideration only, and the Board is not imposing limitations but rather sharing this fact with SCO given that its participation commences at a later stage in this process.

Finally, the Board notes that costs will be considered for this intervener, as with all other interveners, at the conclusion of proceedings in accordance with the Board's regular rates schedule and intervention criteria.

**10.3   Scope of Risk Review**

All participants at the March 12th PHC were invited to address the issue of refinement of the scope of the risk review currently proceeding before the Board.  MIPUG, MH, CAC/MSOS, RCM/TREE and the independent experts all held the view that it would benefit the process as a whole in a variety of ways to attempt to refine the scope of the risk review to be conducted as part of this process.

The submission of MIPUG and MH, as to a broad framework with questions which may guide the Board and the participants in examination of risk issues, is helpful and the Board recommends that all participants keep in mind as points of reference the framework identified by MIPUG with sub-issues regarding categories of risk, as well as the particular questions identified by MH which the Board accepts as addressing the key issues of its risk mandate at a high level as follows:

1.   Are the policies and procedures in governance structures in place at MH to manage risks reasonable?

2.   Is Manitoba Hydro's approach to risk management appropriate in the context of the objects and purposes of *The Manitoba Hydro Act*?

3.   Does Manitoba Hydro's decision making criteria reflect a reasonable risk/reward tolerance taking into account the consideration of the interests of its stakeholders?

As to further detail to guide the IR process for hearing participants at this stage, the Board adopts the outline proposed by CAC/MSOS which in the Board's view will allow for the process of full review of MH's risks.

The Board has yet to have access to and make public MH's relevant risk reports, which will further inform and guide the risk review.  Contributions by the independent consultants and other consultants who generate reports will be guided by the questions as identified herein, as well as the detail of scope which the Board adopts as presented by CAC/MSOS, but will not be bound within the confines of these questions and associated issues list, if the experts identify a material risk not otherwise captured.

The Board is of the view that the pending disclosure of risk reports, the KPMG Report, and ultimately the production of the report of the independent experts will solidify the major areas of risk and related matters to allow for the comprehensive review as planned.

The Board also notes that each year, MH invests hundreds of millions in projects related to new capital, and almost all of that is being capitalized, meaning the risks of not proceeding with the proposed capital projects increase.

The Board requires MH to file its export contracts and pending term sheets as part of this GRA process, and directs that term sheets are neither to be turned into sales agreements until a proper capital and risk review has taken place, nor full commitment to major capital is to take place until the review has been conducted.

The Board will not exclude any element in the risk review which it deems to be of significance.

The Board wishes to indicate that it has no problem with the technical conference to be put on by MH for the benefit of interveners and the Board, but that conference will not necessarily limit the scope of the Board's review, though it may inform it.

Beyond the refinement of scope pursuant to this Section, the Board does not intend to publish a specific issues list which will limit risk inquiries or bind the Board or any of the participants.

**10.4    Terms of Reference for Independent Experts**

Attached hereto are the terms of reference for the independent experts as approved by the Board. The independent experts are to consider the comments of the Board herein respecting the scope of the risk review as a guideline to inform, but not bind, their inquiries.

The Board also notes that some additional direction respecting the process for completion of the work of the independent experts is warranted.

The independent experts will have access to MH's models and data in order to complete their inquiries pursuant to the terms of reference.  It is not intended that these experts are to become an informal conduit, to other interveners, of otherwise confidential information uncovered in their work.  The independent experts are to complete their report, and the subsequent information request process and testimony utilizing non-confidential/ public information only, as will be described herein.

The Board understands that MH and the independent experts will enter into a Non-Disclosure Agreement (NDA), which will bind the experts to non-disclosure in their reports and testimony of specifically defined categories of facts, information and/or data.  Although the experts will be bound by the agreement in the carrying out of their responsibilities, it remains for MH and the parties to this proceeding to resolve issues of confidentiality respecting MH's alleged sensitive information or to seek, by way a motion, a ruling from the Board on the information.

The Board will not entertain any motions to force disclosure of information via the independent experts.  In the event of any challenge to the designation of information as confidential, any and all such challenges shall not be brought against the independent experts, but rather shall be brought in the form of a motion in the ordinary course of the PUB's proceedings, in accordance with the Board's Rules, and with MH as the respondent.

While the Board is not privy to the specific alleged confidential information which MH may seek to protect, MH has raised certain categories of such information in this process which the Board expects may be the basis of such sought after protection.

The Board expects the independent experts to be able to report on, at a minimum, the general structures of MH's models, a description of the data inputs used by MH, a description of the data sources, assumptions used by MH in the operations of its models, and the outputs obtained by MH, all of which must also be relevant to the matters under consideration by the independent experts as part of the risk review.

Finally, the NDA will be a public document in this process.

## 10.5    April 1, 2010 Interim Rates

The topic of April 1, 2010 interim rates was identified as an agenda item for the March 12, 2010 PHC, and parties were provided an opportunity to comment on MH's proposed resident's rate schedules which increased only the tail block rate to recover the required additional revenue from residential customers.

On March 18, 2010, MH provided further options for structuring the interim residential rate increase.

After review and consideration of the submissions, the Board will direct MH to file revised rate schedules, proof of revenue and bill impacts, where the first block rate is increased to recover approximately 1/3 of the overall 2.9% increase, with the balance of the increase coming from an increase in the tail block rate.

The Board confirms that the April 1, 2010 rates have been granted on an interim basis only, subject to amendment on finalization of the GRA process and the Board's final rate ruling.

**10.6    Timetable**

In accordance with ongoing work between Board counsel and Interveners and their counsel, a new timetable for completion of all steps in the GRA process is attached to this Order.  The Board has separated the proceedings between what has typically been GRA inquiries and evidence (on Revenue Requirement, Cost of Service and Rate Design), from the risk review aspects of this GRA, as noted on the timetable.  As noted early herein, the Board's goal is to complete this GRA process in 2010, and accordingly it urges all participants to assist the Board in this goal by respecting the timelines identified herein.  The Board intends aspects of the review of MH's risks and risk management will be conducted at the commencement of the oral hearing.


# 11.0    Concluding Remarks

In conclusion, the Board wishes to thank all participants to the March 12, 2010 PHC and the efforts taken by all participants to provide the Board with their views and in particular, the representations made by the NYC and counsel for SCO.

The Board notes that the NYC's cooperation with the Board will not impair in anyway the ability of the Ombudsman or the Auditor General to conduct reviews into other aspects of the NYC disclosures if those bodies choose to proceed in future.  The NYC's reports will be reviewed by the independent consultants and put on the public record (after the redaction process outlined herein) thus the legitimate concerns of the NYC will be open to further review by interveners and or other parties.  The Board will keep the identity of the NYC protected.

The Board finds that the process outlined herein combined with the participation of the full group of interveners which now include SCO, within the refinement of scope for review as outlined in this Order, will supply the Board with the necessary information to allow it to

consider rates in light of all risks.   To the extent that the Board can clear away clouds of uncertainty over MH for the benefit of Manitoba, a comprehensive risk review at this time has additional significant worth.

Board decisions may be appealed in accordance with the provisions of Section 58 of *The Public Utilities Board Act*, or reviewed in accordance with Section 36 of the Board's Rules of Practice and Procedure (Rules).   The Board's Rules maybe viewed on the Board's website at www.pub.gov.mb.ca.

## 12.0   IT IS THEREFORE ORDERED THAT:

1.   The New York Consultant's Application for intervener status is denied, and the role of the NYC, in the risk review process to be conducted within MH's GRA, BE AND IS HEREBY APPROVED, as set out in this order;

2.   Southern Chiefs Organization's Application for intervener status BE AND IS HEREBY APPROVED;

3.   The scope of the risk and risk management review BE AND IS HEREBY APPROVED, as set out in this order;

4.   The timetable and procedures for the orderly exchange of information BE AND IS HEREBY APPROVED as attached in Schedules "A" and "B";

5.   The Terms of Reference for the independent experts BE AND IS HEREBY APPROVED as attached in Schedule "C";

March 26, 2010
Order No. 30/10
Page 46 of 53

6.  MH file, for Board approval, rate schedules for interim April 1, 2010 rates which includes the first block of residential rates being increased so as to recover approximately one-third (1/3) of the overall 2.9% interim increase in residential revenue, with the balance being generated from an increase in the tail block rate.

THE PUBLIC UTILITIES BOARD

"ROBERT MAYER, Q.C."
Vice-Chairman

"GERRY GAUDREAU, CMA"
Secretary

Certified a true copy of Order No. 30/10
issued by The Public Utilities Board

_____
Secretary

## SCHEDULE "A"

**MANITOBA HYDRO 2010/11 & 2011/12
GENERAL RATE APPLICATION
Revised Timetable**

| Item | Date |
|------|------|
| Manitoba Hydro (MH) to file Application (RR/COS/RD) | November 30/09 |
| PUB Approval of Notice | December 7/09 |
| MH to Publish Notice in Daily/Weekly Newspapers | December 12 & 18/09 |
| Interested Parties to Register with the PUB for Intervener Status | December 21/09 |
| Pre-Hearing Conference | December 10 & 22/09 - March 12/10 |
| MH to be in receipt of 1st Round Information Requests (all parties) (on RR, COS, RD) | February 3/10 |
| MH to file responses to 1st Round Information Requests (RR/COS/RD) | March 25 |
| MH to be in receipt of 2nd Round Information Requests (RR/COS/RD) | April 15 |
| MH to file only with the Board unredacted risk reports by KPMG; ICF; NYC; MH | April 15 |
| MH to file only with the Board its proposed redacted versions of risk reports by KPMG; ICF; NYC and MH | April 15 |
| NYC to file, only with the Board, its proposed redactions to the risk reports by KPMG; NYC and MH | April 23 |
| Redacted risk reports to be circulated by Board to GRA parties, with request for written submissions | April 23 |
| PUB Approval of Reminder Notice | TBD |

| | |
|---|---|
| MH to Publish Reminder Notice in Daily/Weekly Newspapers | TBD |
| MH Workshop to be held | May 4 – 6 |
| MH to file responses to 2nd Round Information Requests (RR/COS/RD) | May 13 |
| Risk IR's re all Risk report to be filed | May 13 |
| Responses to Risk IR's to be filed | June 3 |
| All parties to be in receipt of intervener evidence (on RR/COS/RD) | May 27 |
| All parties to file information requests of intervener evidence (RR/COS/RD) | June 10 |
| Interveners to file responses to information requests (RR/COS/RD) | June 24 |
| MH to file rebuttal (on RR/COS/RD) | July 8 |
| Risk Report to be filed – PUB Independent Expert | July 8 |
| IR's of PUB Independent Expert to be filed | July 22 |
| Responses to Risk IR's to be filed by PUB Independent Expert | August 5 |
| All parties to be in receipt of Intervener Evidence (Risk) | August 12 |
| All Parties to file Information Requests of Intervener Evidence (on risk) | August 19 |
| Interveners to file responses to Information Requests (on risk) | August 26 |
| MH to file Rebuttal Evidence (on risk) | September 2 |
| 2010/11 GRA Hearing Commences | September 8 |

(RR/COS/RD = Revenue Requirement, Cost of Service, Rate Design)

(Risk = Specific review of MH's risks and risk management)

## SCHEDULE "B"

## PROCEDURES TO BE FOLLOWED AT THE
## MANITOBA HYDRO
## 2010/2011 AND 2011/2012 RATES

| | | | |
|---|---|---|---|
| 1. | Hearing and Rural Meetings: | a) | Winnipeg hearing will be held at the Board's office, 4th floor, 330 Portage Avenue, Winnipeg, commencing on September 8, 2010 at 9:00 a.m. and continuing thereafter as necessary. |
| | | b) | Rural Meetings (if necessary) - time, location and place to be identified. |

2.      Hearing Times Each Day: 9:00 a.m. to 12:00 Noon
          1:15 p.m. to 4:00 p.m.
          (amendments may be made by the Board at the hearing)

3.      Assigned Sittings:      Presenters will be heard commencing at 1:15 p.m., on September 8, 2010 and at 7:00 p.m. if necessary.

4.      Opening Statements by Board Counsel, by Counsel for MH and other Counsel or representatives of registered interveners.

5.      (a)  MH to file their application and supporting evidence.

        (b)  MH to introduce witnesses.  Board Counsel and interveners to cross-examine the Corporation's witnesses (order to be determined).

6.      (a)  Leading of testimony by witnesses for interveners, if any, will be in alphabetical order by name of interveners and updated as necessary.

        (b)  Witnesses to be available for cross-examination by all parties following oral direct testimony.

7.      All interrogatories are to be filed and responded to using the prefixes as assigned by the Board when interveners are registered (set out in the body of the Order). The party requesting information is to use firstly their prefix followed by the

March 26, 2010
Order No. 30/10
Page 50 of 53

prefix of the party being asked e.g. PUB/MH and PUB/MH (Risk), etc. Interrogatories are to be numbered sequentially through 1st and 2nd rounds.

8.     All pre-filed evidentiary material to be filed at the commencement of the hearing by Board Counsel using assigned prefixes.

9.     All witnesses to highlight their evidence.

10.     All witnesses to be sworn or affirmed.

11.     Daily transcripts will be available.  Parties to make arrangements with the Reporter. Transcripts can be found at www.pub.gov.mb.ca at no charge.

12.     It is the Board's request that all motions be dealt with pursuant to the Board's Timetable.

13.     The Board's Rules of Practice and Procedure (available on the Board's website) dealing with the Awarding of Costs will apply to all matters before the Board.

14.     The Board indicates its willingness to be available for any problems that may arise during the exchange of information at any time, such time to be arranged through Board Counsel.

15.     Seven (5) copies of material are to be submitted to the Board's offices and three (2) copies are to be submitted to Board Counsel at the following address: Attention: R. F. Peters, Fillmore Riley LLP, 1700 – 360 Main Street, Winnipeg, Manitoba, R3C 3Z3.

16.     Except for all material required to be filed by MH, as previously arranged by MH, electronic copies of all material including the evidence of parties, are required to be submitted to the Board's e-mail address:  publicutilities@gov.mb.ca.  Where schedules accompany an electronic file, that filing must be discrete and include only the item and schedules to which each refers.  The electronic files shall be named in accordance with their parties prefix as per #7.  All electronic filings shall be in Adobe Acrobat format, without protection securities that might preclude them from being included in one Multiple Files Document, and must not restrict the readers' ability to copy extracts from the filings.

March 26, 2010
Order No. 30/10
Page 51 of 53

## SCHEDULE "C"

## THE PUBLIC UTILITIES BOARD OF MANITOBA
## TERMS OF REFERENCE FOR RETAINER OF INDEPENDENT EXPERTS:
## MANITOBA HYDRO RISK MANAGEMENT ISSUES

In the Matter of
**MANITOBA HYDRO GRA 2010/11 and 2011/12,**

Manitoba Hydro has filed a General Rate Application ("GRA") before the Public Utilities Board of Manitoba ("PUB") for setting of electricity rates for the fiscal years 2010/11 and 2011/12. The PUB will complete a comprehensive review of risks and risk management faced by Manitoba Hydro as part of the GRA process, and will consider the impact of risk and risk management on consumer rates and the financial health of the Utility.

The PUB has jurisdiction to appoint any person to make an inquiry and report upon any matter within its jurisdiction, and hereby appoints Dr. Atif A. Kubursi and Dr. Lonnie Magee, as well as any other consultants deemed required and approved by the PUB, ("The Consultants") as independent experts in the Manitoba Hydro GRA, pursuant to the tasks outlined herein and these terms of reference.

The Consultants' retainers are established for the specific purposes set out herein and continue at the discretion of the PUB. The Consultants are to be paid an hourly fee for services rendered at the rate prescribed by the Board. All work products by the Consultants related to the GRA become the sole property of the PUB.

The Consultants certify and represent, upon the acceptance of this retainer that they are able to act as independent experts under these terms of reference and know of no conflict which may impede their independence to complete the identified tasks.

The Consultants certify and represent, upon the acceptance of this retainer, that they are not currently and never have been under retainer or affiliated with any of the following persons or organizations:
- o   The Province of Manitoba
- o   Manitoba Hydro
- o   Consumers' Association of Canada (Manitoba) Inc. and Manitoba Society of Seniors

- o  Manitoba Keewatinowi Okimakanak, Inc.
- o  Manitoba Industrial Power Users Group
- o  City of Winnipeg
- o  Resource Conservation Manitoba and Time to Respect Earth's Ecosystems
- o  ICF
- o  Respondent in Manitoba Court of Queen's Bench Suit No. CI-09-01-64372
- o  RiskAdvisory
- o  Southern Chiefs Organization
- o  McCullough Research

The Consultants certify and represent, upon the taking of this retainer, that they are not currently and have not been under retainer or affiliated with any of the following persons or entities since 2004:

- o  KPMG Management Consultants

The Consultants certify and represent that they will not publicly divulge, or seek to profit from any commercially sensitive or confidential information that they review or receive for purposes of the GRA.

The Consultants are retained by the PUB as independent experts for the purposes outlined herein below:

1.  Identify and explain general enterprise risk management concepts and best practices.

2.  Review and evaluate all relevant available reports and supporting data, systems, models and analyzes which address risk management or contain information affecting risk management for Manitoba Hydro and report on findings arising from this review.

3.  Review and evaluate Manitoba Hydro's water supply data and management models for impact upon identified risk factors, opportunities and risk mitigation options.

4.  Obtain any relevant information required from MH or other participants to the GRA process pertaining to risk management issues and impacts on MH's 20 year IFF.

5.  Identify all material operational and business risks for MH and MH's 20 year IFF.

6.  Prepare statistical analyses, quantification of risks and provide other analytical reports to consider the probabilities of all material operational and business risks of Manitoba Hydro.

7.   Provide recommendations for risk mitigation measures to be considered by MH and future reporting requirements for regulatory purposes.

8.   To be available through counsel for the Consultants, as a resource on general risk management inquiries, as reasonably required, to any Party to the GRA and to receive input on possible relevant risk issues from any Party to the GRA (but which shall not bind the Consultants). Any additional costs are subject to PUB approval.

9.   Provide a written report covering matters in items 1 to 7 herein with supporting data for use in the current MH GRA and any related applications before the PUB.

10.  Participate as independent witnesses before the PUB in the current MH GRA and all related Applications before the PUB, including pre-hearing processes, responding to Information Requests and testifying / attending for cross examination at the oral hearing of the MH GRA and all related Applications before the PUB.

The Consultants are empowered to communicate with all parties to the GRA, and any other person or entity which they determine necessary for the purposes of completing the tasks identified herein. The Consultants are empowered to request and obtain all necessary documents from all parties which they determine as necessary for the purposes of completing the tasks identified herein, subject only to the PUB's Orders and directives which have or which may be issued in the Manitoba Hydro GRA and related processes dealing with the matters under this retainer.

The Consultants undertake to allocate reasonable time and resources to this retainer so as to complete initial inquiries and provide a written report as determined by the Schedule and Timetable approved by the Board.

The Consultants agree to seek approval of the PUB for any retainer arrangement they may make for subcontracting of support services required to complete his report, and will provide all necessary information respecting such sub-contract to the PUB so that it may approve the sub-contract.

The Consultants may retain counsel to assist them in matters respecting the completion of this retainer and participation in the GRA hearing process, and all ancillary matters thereto. The costs for the Consultant's counsel are to be at PUB approved rates.

The Consultants will be bound by the laws of Manitoba.