UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                            :
THE A STAR GROUP, INC,                 :
                                            :
                Plaintiff,              :
                                            :       13 Civ. 4501 (PAC)
   -against-                         :
                                            :       **ORDER AND OPINION**
MANITOBA HYDRO, KPMG LLP     :
(CANADA), KPMG LLP (US), and    :
MANITOBA PUBLIC UTILIES BOARD, :
                                            :
                Defendants.          :
------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILE
DOC #: _____
DATE FILED: June 30, 2014

HONORABLE PAUL A. CROTTY, United States District Judge:

       Plaintiff The A Star Group, Inc. ("AStar")[1] alleges 15 claims against Manitoba Hydro ("Hydro"), KPMG LLP (Canada), KPMG LLP (US) (collectively, "KMPG"), and the Manitoba Public Utilities Board ("PUB") (collectively, "Defendants"), *inter alia*, for breach of contract, misappropriation of trade secrets, unfair competition, copyright infringement, unjust enrichment, and tortious interference with contract. From 2004 to 2008, AStar worked as an independent consultant for Hydro, the electric power and natural gas utility for Manitoba, Canada, and purports to have uncovered series risk management issues at Hydro. When the arrangement with Hydro ended, AStar decided to switch sides to become a "whistleblower." It supplied various documents to PUB for use in its regulatory review of Hydro. Subsequently, PUB released the reports AStar had supplied to the public. At about the same time, Hydro retained KPMG to review AStar's findings and provided KPMG with AStar's reports. Plaintiff claims that its

---

[1] AStar is a New York-based risk consulting and software firm founded by Samantha Kumaran, who is its principal and apparently only officer. Compl. ¶¶ 2-3.

reports contained confidential information and therefore Defendants should be held liable for the disclosure and use of that information.

On November 22, 2013, Defendants moved to dismiss the Complaint. For the following reasons, Defendants' motions to dismiss are GRANTED with prejudice.

## **BACKGROUND**[2]

### I.     PUB's Oversight of Hydro

Hydro, whose principal business is the generation of hydro-electric power, is a Crown Corporation formed under the laws of Manitoba, Canada. Compl. ¶¶ 21-22; *see* Declaration of Kenneth E. Lee in Support of Defendant the Public Utilities Board of Manitoba's Motion to Dismiss and Strike the Demand for a Jury Trial ("Lee Decl."), ECF No. 29, Ex. A (The Manitoba Hydro Act). PUB has exclusive jurisdiction to review Hydro's proposed service rate charges. *See id*., Ex. B (The Crown Corporations Public Review and Accountability Act). When Hydro applies for a rate increase, PUB conducts a general rate application proceeding ("GRA") to determine whether the requested change is in accordance with Hydro's mandate and the public interest. *See id*., Ex. B.

GRA proceedings are public, and it is presumed that all documents filed with PUB will be placed "on the public record." *See id*., Ex. D, PUB Rules of Practice and Procedure § 13(1). Rule 13 also allows PUB to protect information it deems to be commercially sensitive

---

[2] The following section is based on AStar's allegations, which are assumed to be true. The Court also relies on documents not attached the complaint, but were either incorporated into the complaint by reference, relied upon by AStar in bringing the suit, or their accuracy cannot reasonably be questioned. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007); Fed. R. Evid. 201(b)(2); *see Jordan (Bermuda) Inv. Co. v. Hunter Green Inv.*, Ltd., 154 F. Supp. 2d 682, 689 (S.D.N.Y. 2001) (permitting judicial notice of foreign judgments). Documents filed in another court are considered "not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings." *See Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc*., 146 F.3d 66, 70 (2d Cir. 1998).

information or trade secrets. *See id*., Ex. D, PUB Rule § 13(2).  PUB has the discretion to place the documents in the public record, redact them, or withhold them entirely.  *See id.*, Ex. D, PUB Rule § 13(3).  If the party who originally filed the document objects to its release, it may request that the document be withdrawn.  *See id.*, Ex. D, PUB Rule § 13(5).  PUB's decision may be appealed to the Manitoba Court of Appeal.  *See id*., Ex. C § 58(1).

## II.     AStar's Work for Hydo

In late 2004, Hydro engaged AStar to assist in addressing its growing risk management issues.  Compl. ¶ 76.  Hydro and AStar subsequently entered into the Master Service Agreement ("MSA") and Software License Agreement ("SLA"), which governed the terms of AStar's engagement.  *Id.* ¶ 92; *see* Declaration of Michael R. Hepworth in Support of Manitoba Hydro's Motion to Dismiss ("Hepworth Decl."), ECF No. 23, Exs. G & L.  Both agreements provide that Hydro will maintain the confidentiality of AStar's proprietary information and trade secrets; and not disclose the information to third parties.  Compl. ¶¶ 94-106; *see* Hepworth Decl., Ex. G §§ 8, 10.1, 10.4, 10.6(b), Ex. L §§ 5.5-5.6, 8.1.  Both agreements also contain a New York governing law clause and forum selection clause.  *See* Hepworth Decl., Ex. G § 21.2, Ex. L § 12.3-12.4.  The parties subsequently entered into letter agreements on August 21, 2007 and January 31, 2008 extending the terms of the MSA and SLA (the "letter agreements").  Compl. ¶¶ 107-11.

AStar alleges that it uncovered a number of management issues at Hydro, including (a) discrepancies, misalignments, and risks in the hydraulic water management system, *id.* ¶ 121, (b) operational risks, *id.* ¶ 122, and (c) serious flaws in the front office business approach, *id.* ¶ 123. On September 29, 2008, AStar prepared advanced findings of its Hydraulics report and provided them to Hydro CEO Bob Brennan.  *Id.* ¶ 139.  AStar concluded that Hydro operated far below optimum and would face the risk of forced blackouts, if the flaws were not corrected

immediately. *Id.* ¶ 140. The next day, Hydro terminated its relationship with AStar. *Id.* ¶ 142.

### III.  KPMG's Work for Hydro

Subsequently, Hydro retained KPMG to analyze AStar's findings and ultimately prepare a report either validating or rebutting AStar's analysis. *Id.* ¶ 162-63.[3] On December 21, 2009, Hydro filed an action with the Manitoba Court of Queen's Bench seeking approval to publically release KPMG's analysis. *Id.* ¶ 176. On January 22, and 29, 2010, the court ordered that "no person shall publish in any newspaper, radio, television, internet or other medium of mass communication any information from any document filed or evidence taken in this proceeding that discloses the identity of the respondent or of any principal of the respondent." *See* Hepworth Decl., Exs. J & K.

On February 18, 2010, David Cormie, a Hydro executive, filed an affidavit with the court in support of its application (the "Cormie Affidavit"), with AStar's name redacted. *See* Hepworth Decl., Ex. B. On the same day, Hydro published the Cormie Affidavit on its website. *See* Compl. ¶¶ 180, 182. On April 15, 2010, KPMG completed its external quality review of the risk management issues identified by AStar (the "KPMG report"). *See* Declaration of Daniel B. Goldman in Support of Motion to Dismiss of KPMG ("Goldman Decl."), ECF No. 26, Ex. 3. The Manitoba court did not resolve whether Hydro was authorized to publically release the KPMG report.

### IV.  The 2010-2012 GRA Proceeding

In March 2009, prior to the dispute regarding disclosure, PUB began a GRA proceeding concerning Hydro's proposed rate increase. AStar approached PUB as a "whistleblower" to

---

[3] Although the Complaint does not make this clear, it appears that Hydro retained only KPMG LLP (Canada), who then directed KPMG LLP (US) to perform sub-contract work for Hydro. *See* Compl. ¶ 37.

share its own findings on Hydro.  Compl. ¶ 153.  On September 29, 2009, AStar agreed to provide PUB with its reports as part of the GRA proceeding.  *Id.* ¶¶ 157-58; *see* Affidavit of Jesse Strauss in Opposition to Defendants' Motions to Dismiss ("Strauss Aff."), ECF No. 42, Exs. A & B.  AStar also applied to appear as an intervener in the GRA proceeding, which would have included a comprehensive review of Hydro's risk management on behalf of PUB.  *See* Lee Decl., Ex. F, at 7.  On March 26, 2010, PUB denied AStar's request but sought AStar's cooperation and assistance for the "purpose of enabling its reports to be placed on the public record" and in order to "meet with and inform the independent experts appointed by the Board as to [AStar's] findings and conclusions."  *Id.*, Ex. F, at 30-39, 36.  AStar met with PUB consultants in New York on June 6, 2010, Compl. ¶¶ 207-11, but ultimately withdrew its documents due to confidentiality concerns.

During this time, PUB also ordered Hydro to provide it with all internal and external risk management reports, including AStar's risk reports and the KPMG report.  *See* Lee Decl., Ex. E, at 31, 47-48 (ordering Hydro to "file all internally and externally prepared reports, since the 2003-04 drought, that address any of and all of the energy supply and other risks faced by [it]").  AStar claimed that the reports contained AStar's proprietary information and trade secrets and proposed redactions.  *See* Compl. ¶¶ 222-26.  But since Hydro—not AStar—filed these documents with PUB, AStar did not have the ability to request that they be withdrawn pursuant to PUB Rule 13(5).  *See* Lee Decl., Ex. D, PUB Rule § 13(5).

On September 20, 2010, PUB issued Order 95/10 (the "Redaction Order"), which provided its final determination on the redaction process.  *See id*., Ex. H.  PUB held that AStar's proposed redactions were unnecessary because the reports "do not contain formulae, any detailed explanation of [AStar]'s methodology, nor any software or hard copy data respecting software

details or outputs generated." *Id.*, Ex. H, at 39. According to PUB, "[t]his finding does not infer that [AStar's] conclusions are not valid, simply that the supporting detail is by and large not contained in the [reports]." *Id.*, Ex., H, at 39. On September 27, 2010, the reports were placed on the public record. Compl. ¶ 232. AStar then moved for leave to appeal PUB's decision to the Manitoba Court of Appeal, but abandoned the motion. *See* Lee Decl., Exs. J, K, & L.

## V. AStar's Allegations

On November 9, 2012, AStar filed its first complaint against Hydro, PUB, and KPMG in this Court. *See* Complaint, *The A Star Group Inc. v. Manitoba Hydro*, No. 12 Civ. 8198, ECF No. 1. On February 28, 2013, the Court held that the 318-page, 1,417-paragraph complaint did not comply with the Federal Rules of Civil Procedure and dismissed the complaint *sua sponte* without prejudice. *See* Transcript, *The A Star Group Inc. v. Manitoba Hydro*, No. 12 Civ. 8198, ECF No. 10. On June 28, 2013, AStar filed the present 70-page complaint under a new civil action number.

AStar's Complaint alleges that Hydro engaged in a campaign to discredit AStar's findings and retaliate against AStar by disclosing AStar's "proprietary information" on Hydro's website and to PUB and KPMG. Compl. ¶¶ 176-81. AStar claims that KPMG and PUB reverse engineered the "proprietary information" and used AStar's methodologies to either compete with AStar, *id.* ¶¶ 166-75, or to build computer software and metrics to measure Hydro's risks, *id.* ¶ 211. As a result, AStar brings 15 claims for breach of contract (Hydro, PUB), aiding and abetting breach of contract (KPMG), breach of covenant of good faith and fair dealing (Hydro), misappropriation of trade secrets (all Defendants), unfair competition and misappropriation of confidential information (Hydro, KPMG), unjust enrichment (Hydro), copyright infringement (all Defendants), and tortious interference (KPMG, PUB).

## DISCUSSION

### I.     Legal Standard

To state a claim for relief, a plaintiff must "provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" *ATSI Commc'ns, Inc.*, 493 F.3d at 98 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  Plaintiff must allege "'enough facts to state a claim to relief that is plausible on its face.'"  *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d Cir. 2010) (quoting *Twombly*, 550 U.S. at 570).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The Court accepts as true all well-pleaded factual allegations and draws all inferences in Plaintiff's favor.  *See Allaire Corp. v. Okumus*, 433 F.3d 248, 249-50 (2d Cir. 2006).

### II.    The Claims Against PUB Are Dismissed

PUB moves to dismiss because it is a foreign sovereign, immune to the Court's jurisdiction.  The Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1330, 1332(a), 1391(f), 1441(d), and 1602-11, provides the sole basis for obtaining jurisdiction over a foreign state. *Saudia Arabia v. Nelson*, 507 U.S. 349, 355 (1993).  A foreign state is immune from federal jurisdiction unless a specific exception applies.  *See* 28 U.S.C. §§ 1330(a), 1604.  AStar asserts that PUB falls within three exceptions to immunity:  (1) the waiver exception under Section 1605(a)(1); (2) the commercial activity exception under Section 1605(a)(2); and (3) the non-commercial torts exception under Section 1605(a)(5).  AStar failed to meet its burden of proof that any of these exceptions are applicable.

AStar first claims that PUB waived its immunity under Section 1605(a)(1) by

contemplating the United States as a possible forum for any dispute with AStar.  *See* Plaintiff's Brief in Opposition to the Motions to Dismiss ("Pl.'s Opp'n"), ECF No. 40, at 9-11.  A foreign state implicitly waives jurisdiction where it "has agreed to arbitration in another country or . . . that the law of a particular country should govern a contract."  H.R. Rep. No. 94-1487, at 18 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604, 6617; *see Smith v. Socialist People's Libyan Arab Jamahiriya*, 101 F.3d 239, 243 (2d Cir. 1996).  But AStar does not claim that either circumstance existed here.  Instead, AStar claims that PUB waived its immunity merely by agreeing not to violate the terms of the MSA and SLA and by suggesting that AStar retain New York counsel.[4]  Yet the MSA and SLA's forum selection clause purported to bind Hydro and AStar, not PUB.  In fact, AStar's September 29, 2009 letter to PUB confirmed its "understanding that the PUB will act in accordance with its own powers of jurisdiction under applicable Canadian laws" and does not mention New York law.  *See* Strauss Aff., Ex. A, at 3.  Furthermore, whether PUB suggested that AStar retain New York counsel has no bearing on whether PUB, itself, submitted to New York jurisdiction.  As a result, AStar fails to demonstrate that PUB implicitly waived its immunity under Section 1605(a)(1).

Next, AStar alleges that PUB engaged in commercial activity pursuant to 1605(a)(2).  *See* Pl.'s Opp'n at 11-12.  The FSIA defines "commercial activity" as "either a regular course of commercial conduct or a particular commercial transaction or act."  28 U.S.C. § 1603(d).  "[A] state engages in commercial activity . . . where it exercises only those powers that can also be exercised by private citizens, as distinct from those powers peculiar to sovereigns."  *Nelson*, 507

---

[4] AStar also points to its own letters "explicitly stating that New York law applied to any dispute regarding the confidentiality of [its] Proprietary Information and that the PUB would be sued in New York if it violated the MSA and SLA."  Pl.'s Opp'n at 10.  But PUB did not agree to or sign these letters so they cannot support AStar's argument.

U.S. at 360 (internal quotation marks omitted).  Any actions taken by PUB, however, were taken in furtherance of its role as a Canadian regulatory body.  Although AStar claims that it "was retained by the PUB to provide commercial services information related to the PUB's review of Hydro," *see* Pl.'s Opp'n at 11-12, PUB explicitly declined to retain AStar for this purpose, *see* Lee Decl., Ex. F, at 30-39.  Instead, PUB requested that AStar explain its past findings to the Board and agreed to pay the costs associated with that request.  This is not commercial activity; rather, it is routine practice for a regulatory body during the course of an investigation.  Furthermore, even if PUB used AStar's proprietary information, *see* Pl.'s Opp'n at 12,—which is entirely unsubstantiated—that use was in furtherance of its investigation, not a commercial activity.  Thus, PUB cannot be subject to the jurisdiction of this Court under the commercial activity exception.

Lastly, AStar argues that PUB waived its immunity by committing a tortious act or omission pursuant to Section 1605(a)(5).  *See* Pl.'s Opp'n at 12.  But the non-commercial tort exception pertains only to "personal injury or death, or damage to or loss of property, occurring in the United States," 28 U.S.C. § 1605(a)(5), and is not applicable to tort actions by defendants abroad, *see In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 109, 115-17 (2d Cir. 2013).  AStar makes no attempt to identify any tort that PUB committed in the United States and therefore cannot establish that the non-commercial tort exception applies.  Accordingly, PUB is entitled to immunity under the FSIA, and this Court lacks jurisdiction over all of AStar's claims against PUB (Counts VIII, XIII, XIV, and XV).

### III. The Claims Against Hydro Are Dismissed

#### A. Breach of Contract

AStar alleges that Hydro breached the MSA (Count I), SLA (Count II), and letter

agreements (Count III) by (1) disclosing AStar's proprietary information to PUB, (2) providing KPMG with AStar's proprietary information, and (3) posting AStar's proprietary information on its website. *See* Pl.'s Opp'n at 16-19. First, Hydro did not breach the agreements when it complied with PUB's March 30, 2009 order by producing AStar's risk reports. *See* Pl.'s Opp'n at 17. Specifically, PUB required Hydro to "file all internally and externally prepared reports, since the 2003-04 drought, that address any of and all of the energy supply and other risks faced by [it]." *See* Lee Decl., Ex. E, at 31, 47-48.[5] The agreements explicitly provided for the "forced disclosure" of AStar's proprietary information "by a court or other governmental body" and therefore authorized Hydro's disclosures to PUB. *See* Hepworth Decl., Ex. G § 8.6, Ex. L § 8.5. Furthermore, plaintiff must plead and—eventually prove—damages resulting from any alleged breach. *See Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank*, 392 F.3d 520, 525 (2d Cir. 2004). But AStar provided its reports to PUB and therefore cannot plausibly allege any damages stemming from Hydro's disclosure of the same information.

Hydro's disclosures to KPMG were also permissible under the agreements because AStar was authorized to disclose confidential information to Hydro's "directors, officers, employees, and agents." *See* Hepworth Decl., Ex. G § 8.1, Ex. L § 8.3. In fact, AStar concedes that KPMG had an "agency relationship with Hydro," *see* Pl.'s Opp'n at 23-24 & n.22; Compl. ¶ 37, and "performed work for Hydro under the MSA," Compl. ¶ 38. Since KPMG was merely working as Hydro's agent to validate AStar's work, Hydro cannot have breached the agreements by providing KPMG with AStar's reports.

Lastly, AStar alleges that Hydro breached the MSA, SLA, and letter agreements by

---

[5] As a regulatory body, PUB is entrusted with all the "powers, rights, and privileges as are vested in the Court of Queen's Bench," including the power to require the production of documents. *See* Lee Decl., Ex. C, § 24(4).

posting AStar's proprietary information and trade secret methodologies on its website. *See* Pl.'s Opp'n at 16-17. But Hydro only posted the Cormie Affidavit to its website. *See* Hepworth Decl., Ex. B, ¶ 5. Rather than containing trade secrets and business proprietary information, *see* Compl. ¶ 180, the Cormie Affidavit merely provides background information on Hydro and AStar's dispute. Moreover, the Cormie affidavit was publically filed with the Manitoba Court of Queen's Bench. Under the agreements, information that "is or becomes publicly known through lawful means" does not constitute confidential information. *See* Hepworth Decl., Ex. G § 8.2; *see also Boccardi Capital Sys., Inc. v. D.E. Shaw Laminar Portfolios*, *LLC*, 355 Fed. App'x 516, 518 (2d Cir. 2009) (slip op.) (holding that information generally available to the public could not support a claim for breach of a confidentiality clause because the clause expressly excluded public information). As a matter of law, the information disclosed in the Cormie Affidavit was not confidential and therefore AStar cannot maintain a claim for breach of contract on this basis. Accordingly, Counts I, II, and III must be dismissed.

### B. Copyright Infringement

AStar's copyright claim against Hydro (Count VIII) also fails to state a claim for relief. Section 411(a) of the Copyright Act "requires copyright holders to register their works before suing for copyright infringement." *See Reed Elsevier, Inc. v. Muchnik*, 559 U.S. 154, 157 (2010). At the time of filing the current complaint, however, AStar only had a pending application for registration and therefore did "not satisfy the registration precondition of Section 411(a)." *See Patrick Collins, Inc. v. John Does 1-7*, No. 12 Civ. 2963, 2012 WL 1889766, at *1 (S.D.N.Y. May 24, 2012). Even if AStar were permitted to file another amended complaint asserting identical claims under the now-registered copyrights, *see* Pl.'s Opp'n at 12-13, its copyright claims would still be deficient. The only potentially copyrighted materials are what

the Complaint describes as "Screen Shots" of its computer software displaying unexplained statistics and graphs. *See* Compl. ¶ 299; Hepworth Decl., Exs. E & F. But AStar does not plausibly allege how or when Hydro or KPMG used these "Screen Shots." Indeed, it appears that the "Screen Shots" do not depict computer software at all; rather, they are simply the results of the risk assessment AStar performed for Hydro. *See* Hepworth Decl., Exs. E & F. As a result, allowing AStar leave to amend its Complaint would be futile because it has not alleged facts that plausibly state a claim for copyright infringement.[6]

### C.     Remaining Claims

AStar also fails to state a claim against Hydro for breach of good faith and fair dealings (Count IV), misappropriation of trade secrets (Count V), misappropriation of confidential information and unfair competition (Count VI), and unjust enrichment (Count VII). These claims are duplicative of AStar's breach of contract claims and do not support an independent claim. *See Bear, Stearns Funding Inc. v. Interface Group-Nevada, Inc.*, 361 F. Supp. 2d 283, 298 (S.D.N.Y. 2005) ("[A] breach of the implied covenant of good faith and fair dealing is redundant where the conduct allegedly violating the implied covenant is also the predicate for a claim of breach of an express provision of the underlying contract."); *Reed Constr. Data Inc. v. McGraw-Hill Cos., Inc.*, 745 F. Supp. 2d 343, 353 (S.D.N.Y. 2010) ("A claim of misappropriation 'must spring from circumstances extraneous to, and not constituting elements of, the contract, although it may be connected with and dependent upon the contract.'" (quoting

---

[6] As the prevailing party on the copyright claim, Hydro requests attorneys' fees under Section 505 of the Copyright Act. *See* Hydro's Mot. at 6-7. Although Second Circuit guidance clearly precludes AStar's copyright infringement claim, AStar's request for leave to amend its complaint is not entirely frivolous or unreasonable. *See Hallford v. Fox Entm't Grp., Inc*., No. 12 Civ. 1806, 2013 WL 2124524, at *1 (S.D.N.Y. Apr. 18, 2013) (directing courts to consider, in part, whether the non-prevailing party's claims were frivolous or objectively reasonable). As a result, the Court declines to award attorneys' fees to Hydro.

*Productivity Software Int'l, Inc. v. Healthcare Techs., Inc.*, No. 93 Civ. 6949, 1995 WL 437526, at *8 (S.D.N.Y. July 25, 1995))); *Orange Cnty. Choppers, Inc. v. Olaes Enters., Inc.*, 497 F. Supp. 2d 541, 558 (S.D.N.Y. 2007) ("[N]o claim [for unfair competition] lies where its underlying allegations are merely a restatement, albeit in slightly different language, of the implied contractual obligations asserted in the cause of action for breach of contract." (internal quotation marks omitted)); *Coty, Inc. v. L'Oreal S.A.*, 320 Fed. App'x 5, 6 (2d Cir. Mar. 31, 2009) (summary order) ("[I]t is black-letter law in New York that recovery on an equitable theory of unjust enrichment is not permitted where the matter at issue is covered by a valid, enforceable contract.").

AStar asserts that these claims are independent of its contract claims in a number of ways. But these arguments are meritless. For example, AStar argues that its misappropriation of trade secrets and unfair competition claims are independent torts because Hydro willfully intended to harm AStar. *See* Pl.'s Opp'n at 20-21, 23. AStar, however, does not plausibly allege that Hydro went "beyond a mere breach of contract and act[ed] in such a way that a trier of fact could infer that it willfully intended to harm the plaintiff." *See Carvel Corp. v. Noonan*, 350 F.3d 6, 16 (2d Cir. 2003). AStar also claims that it had a separate fiduciary relationship with Hydro and that the agreements "were simply a means to facilitate the transfer of knowledge from Plaintiff to Hydro." *See* Pl.'s Opp'n at 23. Yet the Complaint relies exclusively on the confidentiality provisions contained in the contracts, not on a separate business relationship. *See* Compl. ¶¶ 90-111. Thus, Counts IV-VII are duplicative of the breach of contract claims and must be dismissed.

### IV. The Claims Against KPMG Are Dismissed

#### A. Aiding and Abetting Breach of Contract

AStar claims KPMG aided and abetted Hydro's breach of contract (Count IX). New York law, however, provides "no cause of action for aiding and abetting breach of contract," *see Fisch v. New Heights Acad. Charter Sch.*, No. 12 Civ. 2033, 2012 WL 4049959, at *7 (S.D.N.Y. Sept. 13, 2012), and therefore the claim is dismissed.

#### B. Tortious Interference

AStar's tortious interference claim against KPMG (Count XII) also cannot survive KPMG's motion to dismiss. "[W]hen there is knowledge of a contract, and a competitor takes an active part in persuading a party to the contract to breach it by offering better terms or other incentives, there is an unjustifiable interference with the contract." *White Plains Coat & Apron Co. v. Cintas Corp.*, 460 F.3d 281, 285 (2d Cir. 2006) (internal quotation marks omitted). Plaintiff must show an "intentional inducement of the third party breach," not merely that the breach was a collateral effect of the defendant's conduct. *See In re Refco Inc. Sec. Litig.*, 826 F. Supp. 2d 478, 520-21 (S.D.N.Y. 2011) (adopting Special Master Daniel J. Capra's Report and Recommendation). Here, AStar claims that "KPMG induced Hydro to provide it with Plaintiff's Proprietary Information so that after one year, KPMG could use Plaintiff's Proprietary Information to compete with it." Pl.'s Opp'n at 29-30. But the Complaint is devoid of any facts to support this claim. In fact, the Complaint alleges that Hydro first engaged ICF International to analyze its risk issues, Compl. ¶ 160-61, and then "requested" KPMG's assistance in analyzing those issues further, *id.* ¶ 163. Since the facts alleged fail to support the inference that KPMG intentionally induced Hydro's breach of contract, they cannot support a claim for tortious interference.

C.  **Remaining Claims**

AStar also fails to state a claim against KPMG for misappropriation of trade secrets (Count X) and misappropriation of confidential information and unfair competition (Count XI). Since these claims are duplicative of each other, the Court will consider them as a single cause of action. *See Friedman v. Wahrsager*, 848 F. Supp. 2d 278, 300 (E.D.N.Y. 2012). "To succeed on a claim for the misappropriation of trade secrets under New York law, a party must demonstrate: (1) that it possessed a trade secret, and (2) that the defendants used that trade secret in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means." *N. Atl. Instruments, Inc. v. Haber,* 188 F.3d 38, 43-44 (2d Cir. 1999). Here, AStar claims that KPMG had an "agency relationship with Hydro[, which] makes KPMG equally liable for Hydro's breach of contract" and, nonetheless, KPMG's conduct was improper. *See* Pl.'s Opp'n at 23-24 & n.22. But as Hydro's agent, KPMG was authorized to review AStar's confidential information under the contract to validate AStar's findings. *See supra* Part III.A. Furthermore, the Complaint fails to allege that KPMG's conduct rose to the level of "improper means." *See Big Vision Private Ltd. v. E.I. DuPont De Nemours & Co.*, No. 11 Civ. 8511, 2014 WL 812820, at *36 (S.D.N.Y. Mar. 3, 2014) (defining "improper means" as "fraudulent misrepresentations to induce disclosure, tapping of telephone wires, eavesdropping or other espionage" (internal quotations omitted)). Instead, KPMG obtained the information as part of an ordinary consulting arrangement. As a result, the claims against KPMG for misappropriation of trade secrets, unfair competition, and misappropriation of confidential information are dismissed.[7]

---

[7] AStar also alleges a claim for copyright infringement against KPMG (Count VIII). This claim is identical to AStar's copyright claim against Hydro and therefore fails for the same reasons. *See supra* Part III.B.

## CONCLUSION

Accordingly, the Court GRANTS PUB's motion to dismiss with prejudice pursuant to Federal Rule of Civil Procedure 12(b)(1) and Hydro and KPMG's motions to dismiss with prejudice pursuant to Federal Rule of Civil Procedure 12(b)(6). The Clerk of the Court is directed to enter judgment and close this case.

Dated: New York, New York
      June 30, 2014

SO ORDERED

*[signature]*

PAUL A. CROTTY
United States District Judge